## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH AMONTE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DELTIC TIMBER CORP., ROBERT C. NOLAN, JOHN D. ENLOW SR., DEBORAH M. CANNON, RANDOLPH C. COLEY, BERT H. JONES, CHRISTOPH KELLER III, D. MARK LELAND, R. MADISON MURPHY, R. HUNTER PIERSON JR., LENORE M. SULLIVAN, and ROBERT TUDOR III, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Joseph Amonte ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Deltic Timber Corp. ("Deltic" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Deltic, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Deltic and a subsidiary of Potlatch Corporation ("Potlatch").

2.     On October 22, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 1.80 shares of Potlatch common stock for each share of Deltic stock they own (the "Merger Consideration"), representing approximately $1.16 billion in equity value.[1]

3.     On December 7, 2017, in order to convince Deltic shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading S-4 independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.     In particular, the S-4 contains materially incomplete and misleading information concerning the financial forecasts for the Company and Potlatch that were both prepared and relied upon by the Board in recommending the Company's shareholders vote in favor of the Proposed Merger.  The financial forecasts were also utilized by Deltic's financial advisor, Goldman Sachs

---

[1]     Reuters, "Potlach to buy rival Deltic Timber for stock, combine lumber capacity," October 23, 2017, *available at* https://www.reuters.com/article/us-deltictimber-m-a-potlatch/potlatch-to-buy-rival-deltic-timber-for-stock-combine-lumber-capacity-idUSKBN1CS1FB.

& Co. LLC ("Goldman Sachs"), in conducting the valuation analyses in support of its fairness opinion.

6.     It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming stockholder vote in order to allow the Company's stockholders to make an informed decision regarding the Proposed Merger.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Deltic shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Deltic is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Deltic common stock.

12.     Defendant Deltic is incorporated in Delaware and maintains its principal executive offices at 210 East Elm Street, El Dorado, Arkansas 71730.  The Company's common stock trades on the New York Stock Exchange under the ticker symbol "DEL".

13.     Individual Defendant Robert C. Nolan has served as Chairman of the Company's Board of Directors since 1996.

14.     Individual Defendant John D. Enlow, Sr. has served as President, Chief Executive Officer, and as a director of the Company since March 2017.

15.     Individual Defendant Deborah M. Cannon has served as a director of the Company since April 2017.

16.     Individual Defendant Randolph C. Coley has served as a director of the Company since 2007.

17.     Individual Defendant Bert H. Jones has served as a director of the Company since 2015.

18.     Individual Defendant Christoph Keller, III has served as a director of the Company since 1996.

19.     Individual Defendant D. Mark Leland has served as a director of the Company since 2016.

20.     Individual Defendant R. Madison Murphy has served as a director of the Company since 1996.

21.     Individual Defendant R. Hunter Pierson, Jr. has served as a director of the Company since 1999.

22.     Individual Defendant Lenore M. Sullivan has served as a director of the Company since 2015.

23.     Individual Defendant Robert Tudor III has served as a director of the Company since 2007.

24.     The Individual Defendants referred to in paragraphs 13-23 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Deltic (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of November 7, 2017, there were approximately 12,189,657 shares of Deltic common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Deltic will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of

the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.      **The Proposed Merger**

27.     Deltic Timber Corporation is a vertically integrated natural resources company engaged in the growing and harvesting of timber and the manufacturing and marketing of lumber and medium density fiberboard (MDF).  It operates through four segments: (1) woodlands, which manages all aspects of the Company's timberlands; (2) manufacturing, which consists of its sawmills that manufacture a range of softwood lumber products and a plant that produces MDF; (3) real estate, which includes the Company's four real estate developments and a related country club operation; and (4) corporate.  It is also engaged in real estate development in central Arkansas.[2]

28.     On October 23, 2017, Deltic and Potlatch issued a joint press release announcing the Proposed Merger, which states in pertinent part:

SPOKANE, Wash., EL DORADO, Ark. – October 23, 2017 – Potlatch Corporation (NASDAQ: PCH) ("Potlatch") and Deltic Timber Corporation (NYSE: DEL) ("Deltic") today announced that they have entered into a definitive agreement to combine in an all-stock transaction and create a leading domestic timberland owner and top-tier lumber manufacturer.  The combined company will be named PotlatchDeltic Corporation and its shares will trade on the Nasdaq Stock Market under the ticker PCH.

---

[2]      Reuters, https://www.reuters.com/finance/stocks/companyProfile/DEL (last visited Dec. 15, 2017).

Based on the closing stock prices of Potlatch and Deltic on October 20, 2017, the combined company is expected to have a pro forma equity market capitalization of approximately $3.3 billion and a total enterprise value of more than $4.0 billion, including approximately $700 million in net debt.  Following completion of the transaction, the combined company will have more than 1,500 employees serving over 200 customers through operations across its extensive timberland and lumber manufacturing portfolio.

Under the terms of the agreement, which has been unanimously approved by the Boards of Directors of both companies, Deltic stockholders will receive 1.80 common shares of Potlatch stock for each common share of Deltic that they own. Following the close of the transaction, Potlatch stockholders will own approximately 65% of the combined company, and Deltic stockholders will own approximately 35% on a fully diluted basis.

The agreement also provides for Deltic to convert to a REIT structure, effective at the closing date of the transaction, ensuring the combined company achieves the most efficient tax structure.  As part of the REIT conversion process, Deltic's accumulated earnings and profits, which are estimated to be approximately $250 million, will be distributed to stockholders of the combined company through a dividend consisting of 80% stock and 20% cash by the end of 2018.

The combination brings together two leading timberland owners and lumber manufacturers. Together, the combined company will have a highly productive and diverse timberland portfolio of approximately 2 million acres, with approximately 1.1 million acres in the U.S. South, 600,000 acres in Idaho, and 150,000 acres in Minnesota.  In addition, upon completion of the transaction, the company will operate eight wood products manufacturing facilities, including six lumber manufacturing facilities, one medium density fiberboard ("MDF") facility and one industrial plywood mill.  In total, the combined company will have lumber capacity of 1.2 billion board feet, making it one of the leading producers in the U.S. Furthermore, the company's lumber capacity will be heavily weighted towards high-margin southern yellow pine lumber, with over half of the company's capacity being produced at its three southern mills.  The transaction also combines two highly complementary and successful real estate businesses.

Mike Covey, Chairman and Chief Executive Officer of Potlatch, said, "With this transaction, we unite two great timber companies uniquely positioned to drive value for our stockholders and benefits for our customers, partners and employees.  The complementary businesses make us a natural fit. With Deltic, we gain significant scale particularly through nearly one million acres in Arkansas and substantially expanded sawmill capacity.  Together, we can realize significant productivity improvements by sharing best practices across both businesses, implementing optimal silvicultural practices, increasing harvest levels and improving lumber manufacturing volumes.  We look forward to completing the transaction and are confident that together we will create a top-tier timber REIT."

Robert C. Nolan, Chairman of Deltic, said, "Earlier this year, the Deltic Board of Directors began a comprehensive assessment of a range of options aimed at maximizing value for Deltic stockholders.  The Board is extremely pleased that this process led to our combination with Potlatch, as we believe it offers the best path toward achieving our shared goals.  We are confident that the combined company has the capacity to enhance value greatly in excess of what could be achieved by either company independently."

John Enlow, President and Chief Executive Officer of Deltic, said, "This partnership with Potlatch not only maximizes value for our stockholders but also provides them with the opportunity to participate in the significant upside potential of this combination.  Furthermore, uniting our high-quality assets, including our deeply talented and dedicated employees, will greatly enhance the potential of PotlatchDeltic.  We look forward to working together to ensure a seamless transition and capitalize on the robust opportunities for growth and success."

29.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.  For instance, the Company ended 2016 with a *42% increase* in net income compared to 2015, and a 13.2% increase in net sales compared to the preceding year.  Moreover, the Company's net income in the third quarter of 2017 was *up 66%* compared to 3Q 2016, with net sales up 15% as well over the same period.

30.     Commenting on the Company's future performance in a press release issued on May 3, 2017, Deltic's President and Chief Executive Officer, John D. Enlow, stated the following:

"Deltic continues to benefit from its well-positioned asset base and solid team, which have allowed the Company to improve financial performance over the prior year's first quarter."… "Our average sales price for lumber sold increased 10 percent, along with slightly higher sales volumes compared to the first quarter a year ago.  Stronger lumber demand and uncertainty over the Canada-U.S. trade dispute and duties favorably impacted our markets.  In addition, improved operating metrics at our MDF plant lowered per-unit costs for MDF when compared to last year's first quarter.". . . "Since my appointment as Deltic's President and Chief Executive Officer, my initial focus has been to evaluate the Company's assets, competitive position and market risks and opportunities with a goal to develop a strategic vision that is laser focused on achieving strong operational performance, driving shareholder value and delivering best-in-class returns."[3]

---

[3]     Press Release, "Deltic Announces First Quarter 2017 Results," May 3, 2017, *available at* http://www.deltic.com/ir/1qtr2017earn.pdf.

31.   In sum, it appears that Deltic is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.   It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.   The Materially Incomplete and Misleading S-4

32.   On December 7, 2017, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Merger.   The S-4 solicits the Company's shareholders to vote in favor of the Proposed Merger.   Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Financial Forecasts that Violate Regulation G and SEC Rule 14a-9*

33.   The S-4 fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger.   S-4, 121-123.   The S-4 also fails to provide material information concerning Potlatch's financial forecasts, which were distributed by Deltic's management to its shareholders in connection with the proposed merger. S-4, 119-123.   These financial forecasts were relied upon by the Company's financial advisor, Goldman Sachs, in rendering its fairness opinion.   S-4, 80.

34.     Specifically, the S-4 provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics, such as (1) Adjusted EBITDDA, (2) EBITDDA, and (3) Cash available for distribution, but fails to provide: (i) the line item forecasts detailed below for the metrics used to calculate these non-GAAP measures, or (ii) a reconciliation of the non-GAAP forecasts to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

35.     For Deltic, the S-4 defines Adjusted EBITDDA as "net income plus depreciation, depletion (cost of fee timber harvested) and amortization, real estate costs recovered, taxes and interest." S-4, 123.  However, the S-4 fails to provide an explanation for the differing definitions of Adjusted EBITDDA as used for each company.  With the exception of taxes for Deltic, it fails to provide the values of any of the underlying line items for either definition of Adjusted EBITDDA, and fails to reconcile Adjusted EBITDDA to its most comparable GAAP equivalent. S-4, 123.

36.     For Potlatch, the S-4 defines EBITDDA as "net income (loss) adjusted for interest expense, provision (benefit) for income taxes, depreciation, depletion and amortization, basis of real estate sold and non-cash asset impairment and eliminations."  S-4, 121.  However, the S-4 fails to provide the values of any of the underlying line items.  *Id*.  The S-4 also fails to reconcile EBITDDA to its most comparable GAAP equivalent.

37.     Third, for Potlatch, the S-4 defines cash available for distribution as "cash flow from operating activities adjusted for capital expenditures, which includes timber and timberlands acquisitions."  *Id*.  However, with the exception of capital expenditures, the S-4 fails to provide the values of these line items.  *Id*.  The S-4 also fails to reconcile cash available for distribution to its most comparable GAAP equivalent.

38.    When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

39.    Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Deltic included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[4]

---

[4]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

40.     The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can be inherently misleading, and has therefore heightened its scrutiny of the use of such forecasts.[5] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[6]

41.     More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

42.     Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party such as financial banker has utilized projected non-GAAP financial measures to

---

*GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html. (emphasis added)

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     *Non-GAAP Financial Measures*, U.S. Securities and Exchange Commission (Oct. 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101. To be sure, there are other situations where Regulation G would not apply but are not applicable here.

render a report or opinion to the Board.  To the extent the Board also examined and relied on internal financial forecasts to recommend a transaction, Regulation G applies.

43.     To be sure, in recommending the Proposed Merger to shareholders "the Deltic board had performed a careful assessment of a range of alternatives, including discussions with other parties concerning alternative strategic transactions, continuing to operate on a standalone basis, and continuing to operate on a standalone basis with Deltic converting into a REIT[.]", which "careful assessment" of whether the Company should remain a standalone entity, on information and belief, included  the Board's review  of the Company's future financial projections, and thus, rendering any exemption from Regulation G inapplicable. S-4, 66.

44.     Thus, in order to bring the S-4 into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information on pages [56-57], Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.  At the very least, the Company must disclose the line item forecasts for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such forecasts are necessary to make the non-GAAP forecasts included in the S-4 not misleading.  Indeed, Defendants caution Deltic stockholders regarding the information contained in the financial forecasts, which incorporate non-GAAP financial metrics.  Specifically, with respect to Adjusted EBITDDA, the Company stated: "Adjusted EBITDDA should not be considered in isolation from, and is not intended to represent an alternative to, Deltic's GAAP results."  S-4, 123.  The company stated the same with regards to EBITDDA, saying: "EBITDDA should not be considered in isolation from and is not intended to represent an alternative to Potlatch's GAAP results."  S-4, 121.

***Financial Forecasts that Violate SEC Rule 14a-9***

45.     The financial forecasts at issue were relied upon by the Company's financial advisor, Goldman Sachs, in connection with its valuation analyses and respective fairness opinions. S-4, 80. The opacity concerning the Company's internal forecasts renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a registration statement discloses internal forecasts relied upon by the Board, those forecasts must be complete and accurate.

46.     Moreover, certain line items of the forecasts were also utilized by the Company's financial advisor, Goldman Sachs, to render a report to the Board of its opinion regarding the fairness of the Proposed Transaction. S-4, 80. Specifically, Goldman Sachs utilized certain of management's projected line item financial measures, including Adjusted EBITDDA, to perform many of its various analyses, including illustrative discounted cash flow ("DCF") analyses.[7] S-4, 82, 84-89.

47.     With respect to Goldman Sachs's Illustrative Discounted Cash Flow Analyses for both Deltic and Potlatch, the S-4 states that Goldman Sachs utilized the non-GAAP metric unlevered free cash flows ("UFCF"). S-4, 82. However, the S-4 fails to disclose the value of the unlevered free cash flows, nor, as mentioned previously, values of any of the underlying line items for Adjusted EBITDDA. The absence of this information renders Goldman's discounted cash flow analyses incomplete and misleading.

48.     The definition of UFCF and Adjusted EBITDDA are, in and of itself, and separate and apart from the mandates of Regulation G, materially false and/or misleading in violation of

---

[7]     Plaintiff alleges, based on the clear and plain language of Regulation G, that all non-GAAP internal financial forecasts that were relied on by the Board must comply with Regulation G, even if Goldman Sachs also utilized those financial forecasts.

SEC Rule 14a-9 (17 C.F.R. 240.14a-9).  Because the line items used to calculate Adjusted

EBITDDA and UFCF were not disclosed, stockholders are unable to discern the veracity of

Goldman Sachs' illustrative discounted cash flow analyses.  Without further disclosure of the line

items used in its Adjusted EBITDDA or UFCF calculations, stockholders are unable to compare

Goldman Sachs's calculations with the Company's financial forecasts.  Thus, the Company's

stockholders are being materially misled regarding the value of the Company.

49.     These key inputs are material to Deltic shareholders, and their omission renders the

summary of Goldman Sachs's illustrative DCF analyses incomplete and misleading.  As a highly-

respected professor explained in one of the most thorough law review articles regarding the

fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in

a discounted cash flow analysis a banker takes management's forecasts, and then makes several

key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff,

*Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate

discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value…  The substantial discretion and
> lack of guidelines and standards also makes the process vulnerable to manipulation
> to arrive at the "right" answer for fairness.  This raises a further dilemma in light of
> the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

50.     Clearly, shareholders would find this information material since the Board's

unanimous recommendation that shareholders vote in favor the Proposed Merger was based, in

part on the following:

- its familiarity with, and understanding of, Deltic's business, assets, financial condition, results of operations, current business strategy and prospects;
- information, including discussions with Deltic's management and advisors, regarding Potlatch's business, assets, financial condition, results of operations,

current business strategy and prospects, including the projected long-term financial results of Potlatch;

- the opinion of Goldman Sachs rendered to the Deltic board, to the effect that, as of that date of such opinion and based upon and subject to the factors and assumptions set forth in its opinion, the exchange ratio of 1.80 shares of Potlatch common stock to be paid for each share of outstanding Deltic common stock pursuant to the merger agreement was fair from a financial point of view to the holders (other than Potlatch and its affiliates) of Deltic common stock, as more fully described in the section entitled "—Opinion of Deltic's Financial Advisor" beginning on page 80;

S-4, 64-65.

51.    In sum, the S-4 independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Merger from Deltic shareholders.

52.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

53.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

55.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

56.     The failure to reconcile the numerous non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."

17 C.F.R. § 240.14a-9.

59. Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b).

60. Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company and Potlatch.

61. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

62. The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

63.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

64.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

65.    Deltic is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

66.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

67.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### <u>COUNT III</u>

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

68.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     The Individual Defendants acted as controlling persons of Deltic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Deltic, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

70.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the S-4.

72.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

73.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

74.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

75.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 18, 2017

OF COUNSEL:

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:  */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*